**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

ASSOCIATION OF COMMUNITY ORGANIZATIONS
FOR REFORM NOW,

Plaintiff,

v. C.A. No. 06-208T

TOWN OF EAST GREENWICH, by and through its Town Council Members, MICHAEL B. ISAACS, JOHN M. MCGURK, MATHIAS C. WILKINSON, HENRY V. BOEZI, and KELLY A. PETTI, in their official capacities; its Chief of Police, DAVID DESJARLAIS, in his official capacity; and its Finance Director, THOMAS MATTOS, in his official capacity,

Defendants.

**MEMORANDUM AND ORDER**

ERNEST C. TORRES, Chief Judge

## Introduction

The Association of Community Organizations for Reform Now ("ACORN") brought this action to declare unconstitutional an ordinance of the Town of East Greenwich ("the Ordinance") that regulates door-to-door solicitation of funds. The case, now, is before the Court for consideration of ACORN's motion for a preliminary injunction prohibiting enforcement of that ordinance.

The issues presented are whether the Ordinance's requirement

that solicitors first obtain a permit and/or its prohibition against solicitating after 7:00 p.m. violate ACORN's First Amendment right to freedom of expression. For the reasons hereinafter stated, I answer both questions in the negative and, therefore, deny the motion for a preliminary injunction.

## **<u>Background Facts</u>**

### I. <u>The Challenged Ordinance</u>

East Greenwich is a suburban community that consists primarily of private homes. Chapter 174 of the Town's Code of Ordinances regulates "Peddling and Soliciting." The Ordinance requires anyone who goes door-to-door for the purpose of soliciting funds to obtain a solicitor's permit. The Ordinance also prohibits such solicitation after 7:00 p.m.[1] In addition, the Ordinance allows residents who wish to prohibit door-to-door solicitation, entirely, to do so by posting a sign on their premises.[2]

---

[1]Section 174-12 provides that: "[n]o person shall engage in door-to-door solicitations before the hour of 9:00 a.m. nor after the hour of 7:00 p.m."

[2]Section 174-11, entitled "Soliciting at residences where sign displayed prohibited," provides that:

> [a]ny person residing in the Town may affix to the entrance of his residence a sign containing the legend "No Solicitation." Any person required to be licensed under the provisions of this chapter who shall make or attempt to make any solicitation or sale at a residence so marked shall be deemed to have violated the provisions hereof.

A. <u>The Permit Requirement</u>

The Ordinance provides that, in order to obtain a permit, an application form must be filed with the police department at least five days before the proposed solicitation so that Town officials can verify the information contained in the application. <u>See</u> Code of Ordinances § 174-4(A). However, the police chief testified that, ordinarily, permits are issued within two days unless difficulties are encountered in obtaining verification.

Section 174-4 specifies the information that must be set forth in the application. In pertinent part, it provides:

> **§ 174-4. Application for permit.**
>
> A. . . . The application required in this chapter shall contain the following information or, in lieu thereof, a detailed statement of the reason why such information cannot be furnished.
>
> B. In the case of a charitable solicitation permit:
> (1) The name, address or headquarters of the person applying for the permit.
> (2) If the applicant is not an individual, the names and addresses of the applicant's principal officers and managers.
> (3) The purpose for which such solicitation is to be made, and the use or disposition to be made of any receipts therefrom.
> (4) The names and addresses of the person or persons in charge of conducting the solicitation, and the names and addresses of any persons who will conduct such solicitation, together with a statement as to whether or not any such person has been convicted of any crime involving moral turpitude, and if so, [sic] nature of the offense, the date of such conviction and the sentence imposed, if any.
> (5) The dates upon which the permit is requested for use indicating, if applicable, the special

event for which application is sought.

(6) The length of time for which the right to do business is desired and whether the applicant seeks a daily, special event, or weekly permit.

(7) The place and/or preferred designated area where the goods or property are proposed to be sold, or orders taken for the sale thereof is manufactured or produced, where such goods or products [sic] located at the time the application is filed, and the proposed method of delivery.

(8) An outline as to the method to be used in conducting the solicitation.

(9) The times when it is anticipated such solicitation will be made, giving the dates for the beginning and ending of such solicitation requested.

(10) The most recent copy of the annual report and/or registration form filed with the Director of the Department of Business Regulations [sic] pursuant to the provisions of [R.I. Gen. Laws] 1956, § 5-53.1-1 et seq.

(11) If any representation is to be made in any solicitation that contributions are deductible pursuant to the provisions of the Internal Revenue Code of 1954, as the code has been, or may hereafter be, amended, a copy of the determination letter received by the organization from the Internal Revenue Service indicating that contributions made will be deductible as charitable contributions pursuant to the Internal Revenue Code of 1954.

(12) Copy of charter received from state of incorporation, if any, and tax-exempt number.

(13) A description of any cart, vehicle or other apparatus proposed for use in conjunction with the sale of goods or service.

The police chief testified that this information is used to determine, among other things, whether the organization on behalf of which the solicitation purportedly is being made actually exists; whether it has authorized the solicitation; and whether the individual solicitors have criminal records, any outstanding

warrants, or any history of involvement in fraudulent schemes. Obviously, the information regarding the times of solicitation, the areas to be solicited, and a description of any vehicles to be used also would assist the police in monitoring compliance and responding to residents' inquiries about solicitors coming to their doors.

The Ordinance also requires payment of a modest application fee[3] but there appears to be some confusion as to what fee is applicable to charitable solicitation permits. Subsection 93-1(A) of the Town's Code of Ordinances prescribes a fee of $5.00 per day or $100.00 per year for "[d]oor-to-door solicitation" permits and a fee of $10.00 per day up to a maximum of $200.00 per year for "[h]awkers and peddlers." The police chief testified that the department's practice is to charge charitable organizations that are not selling food a one-time fee of $10.00 regardless of how many individual solicitors are involved.

The Ordinance does not vest Town officials with any discretion to deny a permit. On the contrary, section 174-5 requires that a permit be issued if the application form is properly completed and the applicable fee is paid. That section provides, in pertinent part:

---

[3]Subsection 174-4(D) provides that "[a]ll such applications shall be accompanied by the fee established by the Town Council. However, no fee shall be charged [sic] any hawker and peddler who is exempt from payment by state law."

**§ 174-5. Issuance.**

A. Charitable solicitations. Upon compliance with the provisions of § 174-5B,[[4]] the Police Chief shall issue a hawker's, peddler's and solicitor's permit to the applicant for the period requested, provided that the period shall not exceed one year from the date of issuance.

In fact, no application filed in accordance with the Ordinance's requirements has ever been denied. However, when the information contained in the application form raises concerns about possible fraud or criminal propensities of solicitors, action may be taken to address those concerns. For example, if a background check reveals that individual solicitors have been convicted of serious crimes, the organization is notified and those individual solicitors' names are left off of the list of solicitors that is appended to the permit in the hope that the omission will prompt residents approached by those individuals to question why. Moreover, if a background check reveals that there is an outstanding warrant for a solicitor, the solicitor is arrested.

B. The Curfew Provision

Before 2001, the Ordinance permitted door-to-door solicitation between 9:00 a.m. and 9:00 p.m., seven days per week. In 2001, the curfew was changed to 7:00 p.m. in response to residents' complaints.

---

[4]This appears to be a typographical error. The application requirements applicable to charitable solicitation permits are contained in section 174-4(B).

## II. The Genesis of this Suit

ACORN is an international organization that describes itself as a non-profit "citizens' lobby group," that advocates with respect to "social justice issues" on behalf of "low-income to moderate-income families."

ACORN is active in lobbying for or against passage of state laws on subjects of interest. It attempts to generate public support for its positions and to raise funds through telephone calls, mailings, small gatherings hosted by interested persons, and door-to-door canvassing. ACORN's door-to-door canvassing is conducted by professional solicitors whom ACORN hires and who are terminated if they do not meet fund-raising goals.

Two of ACORN's solicitors testified at the preliminary injunction hearing. Both stated that they had been doing house-to-house solicitation for ACORN in Rhode Island for approximately two months and that, in addition to soliciting contributions, they encourage residents to sign petitions, write letters, and/or make phone calls supporting ACORN's positions. They also testified that ACORN preferred to solicit between 4:00 p.m.-9:00 p.m. because that's when it is most likely that people are at home.

Sometime before April 17, 2006, ACORN decided to mount a door-to-door campaign in East Greenwich in order to raise money and generate support for passage of a bill pending in the Rhode Island General Assembly concerning homeowner loans. According to Jeffrey

Partridge, ACORN's director of canvassing in Rhode Island, East Greenwich was targeted because it was in the district represented by House Minority Leader Robert Watson and, although ACORN didn't know Watson's position on the bill, it wanted to exert pressure on him to support it.

It's not clear how far in advance ACORN began planning its campaign in East Greenwich, but it didn't notify Town officials of its plans until April 17, 2006, the day on which it intended to begin soliciting. On that date, Partridge sent a fax to the East Greenwich Police Department listing the names of ACORN's solicitors and including a map of the areas to be canvassed. However, according to Police Chief David Desjarlais, the faxed documents were illegible.

There is some dispute as to exactly what happened next, but it appears that someone in Chief Desjarlais' office called Mr. Partridge and told him that, in order to solicit funds, ACORN, first, would have to obtain a permit and that it could not conduct door-to-door solicitations after 7:00 p.m. In a subsequent telephone conversation, Chief Desjarlais told Partridge that, if ACORN did not solicit money, no permit would be required and the 7:00 p.m. curfew would not apply.

ACORN declined to file a permit application and, instead, commenced this suit.

## III. The Evidence Presented

During the one-day hearing on ACORN's motion for a preliminary injunction, neither side presented much evidence beyond what, already, has been noted. Chief Desjarlais did testify about past incidents in which an individual posing as the representative of several charitable organizations went door-to-door soliciting contributions and in which another individual engaged in door-to-door canvassing stole a resident's car. Chief Desjarlais also testified that East Greenwich police respond to between twenty-five and thirty-five complaints of breaking and entering each year and that background checks of the individuals listed on solicitation permit applications frequently have revealed criminal records and/or outstanding warrants. In addition, he stated that the department receives resident complaints about solicitors and/or canvassers almost daily and that residents occasionally call asking why a solicitor's name does not appear on the permit he or she displays. However, Chief Desjarlais was unable to describe any differences in the Town's crime rate between 5:00 p.m. and 7:00 p.m. as compared to between 7:00 p.m. and 9:00 p.m.

## **The Preliminary Injunction Standard**

The Supreme Court has said that "a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of

persuasion." Mazurek v. Armstrong, 520 U.S. 968, 972, 117 S. Ct. 1865, 1867, 138 L. Ed. 2d 162, 167 (1997) (*per curiam*) (quoting 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2948, pp. 129-30 (2d ed. 1995)) (emphasis in original); see also Wine & Spirits Retailers, Inc. v. Rhode Island, 364 F. Supp. 2d 172, 175 (D.R.I. 2005) ("A preliminary injunction is considered an extraordinary remedy because it involves the granting of interim relief before the facts are fully developed by a full-blown trial on the merits."), aff'd, 418 F.3d 36 (1st Cir. 2005).

In ruling on a motion for a preliminary injunction, a court must consider four factors:

> (1) the [movant's] likelihood of success on the merits; (2) the potential for irreparable harm if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest.

Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 15 (1st Cir. 1996) (citations omitted); accord Rosario-Urdaz v. Rivera-Hernandez, 350 F.3d 219, 221 (1st Cir. 2003) (citations omitted).

While the First Circuit has indicated that "[n]one of these criteria should be slighted," Auburn News Co. v. Providence Journal Co., 659 F.2d 273, 277 (1st Cir. 1981), it also has said that "[t]he '*sine qua non*' of a preliminary injunction analysis is whether the plaintiff is likely to succeed on the merits of its

claim," SEC v. Fife, 311 F.3d 1, 8 (1st Cir. 2002) (quoting Weaver v. Henderson, 984 F.2d 11, 12 (1st Cir. 1993)). This case provides an apt illustration of that point.

Here, the potential harm to ACORN if a preliminary injunction is not granted is of approximately the same magnitude as the potential harm to the residents of East Greenwich if the preliminary injunction is granted. Moreover, the public interest does not tip the scale in either direction because the public's interest in seeing that speech rights are not unduly burdened, on the one hand, and its interest in protecting the privacy rights of citizens and helping to prevent them from being victims of fraud or crime, on the other hand, are equally strong.

## Analysis

ACORN claims that the permit requirement and the 7:00 p.m. curfew violate its First Amendment right to freedom of expression. ACORN also claims a violation of its Fourteenth Amendment right to equal protection because it alleges that the Ordinance is not enforced against other charitable organizations, but this Court need not consider that claim because ACORN has failed to present any evidence to support it.

East Greenwich argues that any burden on ACORN's speech rights is outweighed by the fact that the Ordinance furthers the Town's interests in preventing fraud, preventing other crimes, and

protecting the privacy rights of its residents.

I. Burden of Proof

The burden of proving entitlement to a preliminary injunction, including the burden of proving likelihood of ultimate success, is on the party seeking the injunction. See Mazurek, 520 U.S. at 972, 117 S. Ct. at 1867, 138 L. Ed. 2d at 167 (citations omitted). However, in the case of alleged First Amendment violations, once the party seeking the injunction establishes that the challenged regulation infringes on his First Amendment rights, he is deemed likely to prevail on the merits unless the government establishes that the challenged regulation otherwise passes constitutional muster. See Ashcroft v. ACLU, 542 U.S. 656, 666, 124 S. Ct. 2783, 2791-92, 159 L. Ed. 2d 690, 701 (2004) (citations omitted); see United States v. Playboy Entm't Group, Inc., 529 U.S. 803, 816, 120 S. Ct. 1878, 1888, 146 L. Ed. 2d 865, 881 (2000) ("When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions.") (citations omitted); see Clark v. Cmty. for Creative Non-Violence, 468 U.S. 288, 294 n.5, 104 S. Ct. 3065, 3069 n.5, 82 L. Ed. 2d 221, 227 n.5 (1984).

Whether and to what extent empirical evidence is required in order to establish a governmental interest that justifies the infringement "will vary up or down with the novelty and

plausibility of the justification raised." Nixon v. Shrink Mo. Gov't PAC, 528 U.S. 377, 391, 120 S. Ct. 897, 906, 145 L. Ed. 2d 886, 900 (2000). The Supreme Court has recognized that, even in the case of regulations that may burden speech,

> [t]he First Amendment does not require a city, before enacting such an ordinance, to conduct new studies or produce evidence independent of that already generated by other cities, so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses.

City of Renton v. Playtime Theatres, Inc., 475 U.S. 41, 51-52, 106 S. Ct. 925, 931, 89 L. Ed. 2d 29, 40 (1986).

The First Circuit has not yet addressed the quantum of evidence that a municipality is required to present in order to justify regulation of door-to-door solicitation, in particular, and the circuits that have addressed the question are split. Compare City of Watseka v. Ill. Pub. Action Council, 796 F.2d 1547, 1555-56 (7th Cir. 1986) (invalidating curfew provision, in part, because evidence regarding crime rate was based on statewide rather than local statistics and because those statistics dealt with crimes committed after dark and not specifically with crimes committed during curfew hours of 5:00 p.m. to 9:00 p.m.), aff'd, 479 U.S. 1048, 107 S. Ct. 919, 93 L. Ed. 2d 972 (1987) (mem.), with Pa. Alliance for Jobs & Energy v. Council of Munhall, 743 F.2d 182, 187 (3d Cir. 1984) (upholding curfews imposed on door-to-door canvassing even though no detailed statistical evidence was presented, in part, because the fact "[t]hat unregulated canvassing

poses a risk of crime is well known: 'burglars frequently pose as canvassers'") (quoting Martin v. City of Struthers, 319 U.S. 141, 146, 63 S. Ct. 862, 864, 87 L. Ed. 1313 (1943)).

While the quantum of evidence required to establish that an ordinance regulating door-to-door solicitation serves a municipality's interest in preventing crime or protecting the privacy of residents may vary from case to case, there is no sound reason for requiring a municipality to present extensive statistical evidence in order to prove what, already, is common knowledge. It makes little sense to prohibit a municipality from enacting an ordinance reasonably calculated to protect its residents from crime and/or to preserve its residents' right to privacy until residents actually are harmed or until the municipality reinvents the wheel by conducting exhaustive studies or compiling detailed statistics to confirm what already is known. Both law and logic suggest that a municipality is entitled to rely on the experiences of its peers, "detailed findings" or evidentiary foundations contained in previous court decisions, and/or legislative findings of fact based upon legislators' personal experiences in the communities they serve. See Renton, 475 U.S. at 51-52, 106 S. Ct. at 931, 89 L. Ed. 2d at 40; see City of Erie v. Pap's A.M., 529 U.S. 277, 296-98, 120 S. Ct. 1382, 1395, 146 L. Ed. 2d 265, 283 (2000) (O'Connor, J., for the plurality) (citations omitted).

## II. Likelihood of Success

### A. Regulation of Door-to-Door Canvassing in General

#### 1. Overview

Door-to-door canvassing involves an element of conduct that implicates governmental concerns not triggered by some other kinds of expressive activity. Unlike speech in a public forum that, generally, takes place before an audience that chooses to be there, door-to-door canvassing may infringe on the privacy rights of other persons because it involves the uninvited entry upon private property inhabited by residents who may not welcome the intrusion nor wish to hear the message being communicated. See, e.g., Martin, 319 U.S. at 144, 63 S. Ct. at 864, 87 L. Ed. at 1317 (canvassers, "whether selling pots or distributing leaflets, may lessen the peaceful enjoyment of a home . . ."). Canvassing, especially when conducted during nighttime hours, also presents a risk of criminal activity that is not presented by many other forms of expression. See, e.g., id. ("burglars frequently pose as canvassers, either in order that they may have a pretense to discover whether a house is empty and hence ripe for burglary, or for the purpose of spying out the premises in order that they may return later"). Moreover, when canvassing involves the solicitation of money, it creates a potential for fraud that is not present when speech, alone, is involved. See Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Village of Stratton, 536 U.S. 150,

162, 122 S. Ct. 2080, 2087, 153 L. Ed. 2d 205, 217 (2002) (a municipality's interest in regulating door-to-door canvassing is especially strong "when the solicitation of money is involved") (collecting cases).

Because of these concerns, the Supreme Court consistently has recognized that "the prevention of fraud, the prevention of crime, and the protection of residents' privacy . . . are important interests that [a municipality] may seek to safeguard through some form of regulation of solicitation activity," see id. at 164-65, 122 S. Ct. at 2089, 153 L. Ed. 2d at 218-19; see, e.g., Village of Schaumburg v. Citizens for a Better Env't, 444 U.S. 620, 636, 100 S. Ct. 826, 836, 63 L. Ed. 2d 73, 87 (1980) (recognizing all three interests as "substantial"); see, e.g., Hynes v. Mayor of Oradell, 425 U.S. 610, 616-19, 96 S. Ct. 1755, 1758-60, 48 L. Ed. 2d 243, 250-52 (1976) (recognizing importance of municipality's interest in crime prevention and privacy protection) (citing Martin, 319 U.S. at 144, 63 S. Ct. 862, 87 L. Ed. 1313), and that a municipality's interest in regulating door-to-door canvassing is especially strong "when the solicitation of money is involved," Watchtower, 536 U.S. at 162, 122 S. Ct. at 2087, 153 L. Ed. 2d at 217. Accordingly, it has become well-established that, while the First Amendment affords some protection to door-to-door canvassing, such canvassing is subject to reasonable regulation, especially in cases where the solicitation of money is involved. See id. at 162-63, 122 S. Ct.

at 2087-88, 153 L. Ed. 2d at 217; see Schaumburg, 444 U.S. at 632, 100 S. Ct. at 833-34, 63 L. Ed. 2d at 84.

2. Striking a Balance

The touchstone for determining whether an ordinance regulating door-to-door canvassing passes constitutional muster is whether the ordinance strikes an appropriate "balance between [a municipality's] interests and the effect of the regulation[] on First Amendment rights." Watchtower, 536 U.S. at 163, 122 S. Ct. at 2088, 153 L. Ed. 2d at 218; see Schaumburg, 444 U.S. at 633, 100 S. Ct. at 834, 63 L. Ed. 2d at 85 (regulation must be done "in such a manner as not unduly to intrude upon the rights of free speech") (citation omitted); see Hynes, 425 U.S. at 619, 96 S. Ct. at 1760, 48 L. Ed. 2d at 252 ("There is, of course, no absolute right under the Federal Constitution to enter on the private premises of another and knock on a door for any purpose, and the police power permits reasonable regulation for public safety.").

In attempting to strike that balance, courts have been influenced by a variety of factors including the nature of the speech, the type of regulation, the degree to which the regulation burdens speech and the extent to which the regulation serves a substantial governmental interest. See generally Watchtower, 536 U.S. at 161-63, 122 S. Ct. at 2087-88, 153 L. Ed. 2d at 216-18 (discussing factors) (citations omitted); see Schaumburg, 444 U.S. at 628-32, 100 S. Ct. at 831-34, 63 L. Ed. 2d at 81-85 (same)

(citations omitted); see id. at 640-41, 100 S. Ct. at 838, 63 L. Ed. 2d at 90 (Rehnquist, J., dissenting) (same) (citations omitted).

(a) Nature or Value of the Speech

Historically, the level of First Amendment protection afforded to door-to-door canvassing has depended, in part, on whether the canvassing involves political or religious speech, on the one hand, or commercial speech, on the other hand. Ordinances regulating canvassing that involves nothing more than political advocacy or religious proselytizing have been subject to stricter scrutiny than ordinances regulating only the solicitation of money. See, e.g., Watchtower, 536 U.S. at 165, 122 S. Ct. at 2089, 153 L. Ed. 2d at 219 (noting that, if an ordinance requiring a permit for all door-to-door canvassers had "been construed to apply only to commercial activities and the solicitation of funds," it arguably would have passed muster as serving "the [municipality's] interest in protecting the privacy of its residents and preventing fraud"); see, e.g., Breard v. City of Alexandria, 341 U.S. 622, 642-43, 71 S. Ct. 920, 932-33, 95 L. Ed. 1233, 1248 (1951) (upholding anti-canvassing ordinance because, *inter alia*, it only regulated commercial solicitation) (citation omitted).

The historical distinction between canvassing that involves only pure speech and canvassing that involves the solicitation of money has been somewhat blurred by the holding in Schaumburg that

"charitable solicitation" is entitled to greater protection than "purely commercial speech" because it "is characteristically intertwined with informative and perhaps persuasive speech seeking support for particular causes" and "without solicitation the flow of such information and advocacy would likely cease." 444 U.S. at 632, 100 S. Ct. at 833-34, 63 L. Ed. 2d at 84-85. It is not clear whether Schaumburg meant to adopt a *per se* rule that applies to all "charitable solicitation" or whether the "charity" must show that the solicitation is, in fact, "intertwined" with the communication of a message or an idea. In any event, Schaumburg recognizes that even "charitable" solicitation "is undoubtedly subject to reasonable regulation." 444 U.S. at 632, 100 S. Ct. at 833-34, 63 L. Ed. 2d at 84.

(b) Type of Regulation

Regulations affecting protected speech are subject to a lesser level of scrutiny if they are content-neutral than if they are not. See Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622, 642, 114 S. Ct. 2445, 2459, 129 L. Ed. 2d 497, 517 (1994) (content-based speech restrictions must survive strict scrutiny while laws that are content-neutral generally are subject to intermediate scrutiny) (citations omitted). The reason for the differing degrees of scrutiny is that "content-based burdens on speech raise[] the specter that the government may effectively drive certain ideas or viewpoints from the marketplace." See Simon & Schuster, Inc. v.

Members of the N.Y. State Crime Victims Bd., 502 U.S. 105, 116, 112 S. Ct. 501, 508, 116 L. Ed. 2d 476, 487 (1991) (citation omitted). Thus, it is well-established that the validity of a permit requirement depends, in part, on whether government officials have unbridled discretion to deny a permit and thereby censor ideas with which they may disagree. See Forsyth County v. Nat'list Movement, 505 U.S. 123, 130-31, 112 S. Ct. 2395, 2401-02, 120 L. Ed. 2d 101, 111-12 (1992) (citations omitted).

Another important factor in assessing the constitutionality of an ordinance regulating door-to-door canvassing is whether it amounts to a complete ban or is merely a time, place, and manner restriction. As the Supreme Court has said, "the First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired" and, therefore, even expression "protected by the First Amendment, [is] subject to reasonable time, place, and manner restrictions." Heffron v. Int'l Soc'y for Krishna Consciousness, 452 U.S. 640, 647, 101 S. Ct. 2559, 2564, 69 L. Ed. 2d 298, 306 (1981) (citations omitted). The reason for the distinction is that, unlike an outright ban, a time, place, and manner restriction leaves the speaker free to communicate his message through other channels. See Hill v. Colorado, 530 U.S. 703, 726, 120 S. Ct. 2480, 2494, 147 L. Ed. 2d 597, 617 (2000) (a time, place, and manner restriction is one that "does not entirely foreclose any means of communication")

(citing Ward v. Rock Against Racism, 491 U.S. 781, 109 S. Ct. 2746, 105 L. Ed. 2d 661 (1989)); see United States v. Grace, 461 U.S. 171, 177, 103 S. Ct. 1702, 1707, 75 L. Ed. 2d 736, 743-44 (1983) (differentiating time, place, and manner restrictions from "absolute prohibition[s] on . . . particular type[s] of expression") (citations omitted).

(c) Degree to which Speech is Burdened

The extent of the burden that a regulation imposes on speech is another factor that courts often consider in deciding whether the burden is outweighed by the governmental interested served. For example, in the case of laws governing election procedures, the magnitude of the burden imposed on speech determines the level of scrutiny to be applied. See, e.g., Burdick v. Takushi, 504 U.S. 428, 434, 112 S. Ct. 2059, 2063, 119 L. Ed. 2d 245, 253-54 (1992) ("the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights . . .") (citations omitted). In other cases, courts view the extent of the burden as a factor to be considered in deciding whether a regulation is narrowly tailored to achieve its goal. See, e.g., FEC v. Beaumont, 539 U.S. 146, 161-62, 123 S. Ct. 2200, 2210-11, 156 L. Ed. 2d 179, 193-94 (2003) (citations omitted).

(d) Extent to which Regulation Serves a Substantial Governmental Interest

The fact that a regulation may impose some burden on the

exercise of speech rights does not necessarily render the regulation unconstitutional. Indeed, even content-based burdens may be constitutional when they are necessary to advance a compelling government interest. See, e.g., Burson v. Freeman, 504 U.S. 191, 198, 206, 112 S. Ct. 1846, 1851, 1855, 119 L. Ed. 2d 5, 13-14, 19 (1992) (Blackmun, J., for the plurality) (ban on campaign picketing within specified distance of polling place upheld as necessary to prevent voter intimidation and maintain orderly elections).

Accordingly, one of the most significant factors in assessing the constitutionality of an ordinance regulating door-to-door canvassing and/or solicitation is the extent to which the regulation furthers the municipality's legitimate interests. See, e.g., ACORN v. City of Phoenix, 798 F.2d 1260, 1268-70 (9th Cir. 1986) (upholding ban on entering public streets to solicit occupants of vehicles as a valid time, place, and manner restriction on speech because, *inter alia*, it directly promoted the government's interest in traffic safety). These interests include preventing fraud, preventing crime, and protecting the privacy rights of residents. See, e.g., Watchtower, 536 U.S. at 168-69, 122 S. Ct. at 2090-91, 153 L. Ed. 2d at 222 (voiding canvassing permit requirement because, *inter alia*, it did not actually further the municipality's "important interests" in combating fraud, crime, and invasion of privacy) (citation omitted).

So long as a challenged law furthers a sufficiently important government interest and does not burden substantially more speech than is necessary, it may survive all but the most exacting of First Amendment tests. See Ward, 491 U.S. at 798-800, 109 S. Ct. at 2757-58, 105 L. Ed. 2d at 680-81 (citations omitted).

3. Permit Requirements

The Supreme Court has not yet decided the level of scrutiny to which an ordinance regulating door-to-door solicitation is subject. See Watchtower, 536 U.S. at 164, 122 S. Ct. at 2088, 153 L. Ed. 2d at 218 (finding it "unnecessary" to address the standard of review). Nor has it clearly articulated the standard of review applicable, in general, to permits that governmental officials have no discretion to deny. See MacDonald v. City of Chicago, 243 F.3d 1021, 1029-32 (7th Cir. 2001) (collecting cases), cert. denied, 534 U.S. 1113, 122 S. Ct. 919, 151 L. Ed. 2d 884 (2002).

However, in Schaumburg, the Supreme Court applied what amounted to a form of intermediate scrutiny to an ordinance providing that, in order to obtain a solicitation permit, a charity could not expend more than twenty-five percent of its funds for administrative costs. See 444 U.S. at 624, 636-37, 100 S. Ct. at 829, 836, 63 L. Ed. 2d at 79, 87-88 (citations omitted). Thus, Schaumburg held that a permit requirement:

1. must serve "a sufficiently strong, subordinating interest that the [municipality] is entitled to protect;" and

2. must be "narrowly drawn . . . to serve those interests without unnecessarily interfering with First Amendment freedoms."

Id. (citations omitted); see also Riley v. Nat'l Fed'n of the Blind of N.C., Inc., 487 U.S. 781, 787-89, 108 S. Ct. 2667, 2672-73, 101 L. Ed. 2d 669, 683-84 (1988) (explaining test set forth in Schaumburg) (citations omitted); see also Sec'y of State of Md. v. Joseph H. Munson Co., 467 U.S. 947, 960-61, 104 S. Ct. 2839, 2849, 81 L. Ed. 2d 786, 798 (1984) (same) (citations omitted). Because ordinances that discriminate on the basis of content generally are subject to strict scrutiny, see Turner Broad. Sys., 512 U.S. at 642, 114 S. Ct. at 2459, 129 L. Ed. 2d at 517 (citations omitted), the Schaumburg test, presumably, includes a requirement of content-neutrality, as well.

Unlike the ordinance in Schaumburg that specified various grounds on which a permit could be denied, see 444 U.S. at 622-24, 100 S. Ct. at 828-29, 63 L. Ed. 2d at 78-79, the East Greenwich Ordinance, in effect, provides for automatic issuance of permits. Therefore, there is no reason to subject the East Greenwich Ordinance to any greater level of scrutiny than the intermediate scrutiny applied in Schaumburg. Indeed, it is at least arguable that an ordinance that neither specifies grounds for denying a permit nor confers discretion on municipal officials to do so is merely a time, place, and manner restriction that is subject to a

lesser degree of scrutiny. See Hill, 530 U.S. at 726, 120 S. Ct. at 2494, 147 L. Ed. 2d at 617.

For purposes of intermediate scrutiny analysis, the narrowly drawn requirement differs from the "narrowly tailored" requirement applicable to strict scrutiny analysis. An ordinance does not fail the "narrowly drawn" test simply because there may be some less restrictive method by which the proffered governmental interest might be served. Thus, the Supreme Court has said that "we require the Government to employ the least restrictive means only when the forum is a public one and strict scrutiny applies." United States v. Am. Library Ass'n, Inc., 539 U.S. 194, 207 n.3, 123 S. Ct. 2297, 2305 n.3, 156 L. Ed. 2d 221, 233 n.3 (2003) (Rehnquist, C.J., for the plurality) (emphasis added); see Clark, 468 U.S. at 299, 104 S. Ct. at 3072, 82 L. Ed. 2d at 231 (observing that the narrow tailoring requirement of intermediate scrutiny analysis neither "assign[s] to the judiciary the authority to replace" other government decisionmakers nor "endow[s] the judiciary with the competence" to do so) (quoted, with approval, in Ward, 491 U.S. at 798, 109 S. Ct. at 2757, 105 L. Ed. 2d at 680).

Since it is almost always possible to hypothesize a less restrictive alternative to any ordinance, a rigid "narrowly tailored" requirement would render virtually every ordinance regulating door-to-door solicitation unconstitutional because it always would be possible to conjure up an arguably less restrictive

alternative. Watseka, 796 F.2d at 1564 (Coffey, J., dissenting) (quoting Ill. State Bd. of Elections v. Socialist Workers Party, 440 U.S. 173, 188-89, 99 S. Ct. 983, 59 L. Ed. 2d 230 (1979) (Blackmun, J., concurring)).

Such a requirement also would place courts, rather than elected officials, in the position of deciding which of two possible alternatives better serves a particular governmental purpose. That is a task that courts are ill-equipped to perform because "[t]he expertise of courts lies in determining whether an agency's decision is within the zone of constitutionality, not in choosing between options within that zone." White House Vigil for the ERA Comm. v. Clark, 746 F.2d 1518, 1531 (D.C. Cir. 1984).

As the Supreme Court has stated, "[u]nder intermediate scrutiny, the Government may employ the means of its choosing so long as the . . . regulation promotes a substantial governmental interest that would be achieved less effectively absent the regulation, and does not burden substantially more speech than is necessary to further that interest." Turner Broad. Sys., Inc. v. FCC, 520 U.S. 180, 213-14, 117 S. Ct. 1174, 1198, 137 L. Ed. 2d 369, 402-03 (1997) (citing Turner Broad. Sys., 512 U.S. at 662, 114 S. Ct. at 2469, 129 L. Ed. 2d 497; Ward, 491 U.S. at 799, 109 S. Ct. at 2758, 105 L. Ed. 2d 661) (internal quotation marks omitted).

Of course, that does not mean that the availability of less restrictive alternatives is irrelevant in deciding whether an

ordinance is "narrowly drawn." Clearly, the existence of less restrictive alternatives is a factor to be considered in determining whether the "narrowly drawn" requirement has been satisfied. See id. at 252-53, 117 S. Ct. at 1216-17, 137 L. Ed. 2d at 427-28 (O'Connor, J., dissenting, joined by Scalia, Thomas, and Ginsburg, JJ.) (availability of less restrictive means, while not always fatal under intermediate scrutiny, remains relevant) (citations omitted); accord Am. Library Ass'n, 539 U.S. at 217-18, 123 S. Ct. at 2311-12, 156 L. Ed. 2d at 240-41 (Breyer, J., concurring) (same) (citations omitted).

4. Curfews

Since "the First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired," even protected speech is "subject to reasonable time, place, and manner restrictions." Heffron, 452 U.S. at 647, 101 S. Ct. at 2564, 69 L. Ed. 2d at 306 (citations omitted).

Curfews on door-to-door solicitation are classic time, place, and manner restrictions because, while they limit the times during which solicitation can occur, they do not completely foreclose it. See Hill, 530 U.S. at 726, 120 S. Ct. at 2494, 147 L. Ed. 2d at 617 (time, place, and manner analysis applies "when a content-neutral regulation does not entirely foreclose any means of communication") (citing Ward, 491 U.S. at 798, 109 S. Ct. 2746, 105 L. Ed. 2d 661);

see El Marocco Club, Inc. v. Fox, 110 F. Supp. 2d 54, 61 (D.R.I. 2000).

Although the Supreme Court has not yet decided what test should be applied in determining whether such curfews are unconstitutional, it has recognized that a municipality "may . . . fix reasonable hours when canvassing may be done," Schneider v. New Jersey, 308 U.S. 147, 165, 60 S. Ct. 146, 152, 84 L. Ed. 155, 166 (1939), and, may "regulate the time and manner of solicitation generally, in the interest of public safety, peace, comfort or convenience," Cantwell v. Connecticut, 310 U.S. 296, 306-07, 60 S. Ct. 900, 904, 84 L. Ed. 1213, 1219 (1940), or in order to protect residents "from annoyance, including intrusion upon the hours of rest," see Martin, 319 U.S. at 144, 63 S. Ct. at 864, 87 L. Ed. at 1317.

With respect to time, place, and manner restrictions, in general, the Supreme Court has held that they pass constitutional muster even when the speech takes place in a public forum as long as:

1. "the restrictions 'are justified without reference to the content of the regulated speech,'"
2. "'they are narrowly tailored to serve a significant governmental interest;'" and
3. "'they leave open ample alternative channels for communication of the information.'"

Ward, 491 U.S. at 791, 109 S. Ct. at 2753, 105 L. Ed. 2d at 675 (quoting Clark, 468 U.S. at 293, 104 S. Ct. at 3069, 82 L. Ed. 2d 221) (additional citations omitted); see Heffron, 452 U.S. at 647-49, 101 S. Ct. at 2564, 69 L. Ed. 2d at 306-07 (citations omitted).

The "narrowly tailored" requirement, like the "narrowly drawn" requirement in intermediate scrutiny analysis, does not mean that the challenged ordinance must employ the "least restrictive" means possible to achieve its purpose. Indeed, both the Supreme Court and the First Circuit have expressly rejected a "least restrictive" means requirement. See Ward, 491 U.S. at 798-99, 109 S. Ct. at 2757-58, 105 L. Ed. 2d at 680-81 (citations omitted); see Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 744 (1st Cir. 1995) (quoting Ward); see Knights of Columbus, Council #94 v. Town of Lexington, 272 F.3d 25, 33 (1st Cir. 2001) (citations omitted). In Ward, the Court stated:

> [l]est any confusion on the point remain, we reaffirm today that a regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate, content-neutral interests but that it need not be the least restrictive or least intrusive means of doing so. Rather, the requirement of narrow tailoring is satisfied "so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation."

491 U.S. at 798-99, 109 S. Ct. at 2757-58, 105 L. Ed. 2d at 680 (quoting United States v. Albertini, 472 U.S. 675, 689, 105 S. Ct. 2897, 2906, 86 L. Ed. 2d 536 (1985)) (additional citation omitted); see Nat'l Amusements, 43 F.3d at 744 (quoting Ward).

The manifest purpose of the "ample alternative channels" requirement is to ensure that government does not disguise what, in effect, is a complete ban on speech as a mere time, place, and manner restriction that is subject to a more deferential standard of review. The mere fact that a regulation "diminishes the total quantity of . . . speech" and "simultaneously curtails [a speaker's] opportunity to communicate with some [potential listeners]" does not establish the absence of alternative channels of communication. Nat'l Amusements, 43 F.3d at 745 (citing Members of the City Council of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 803, 104 S. Ct. 2118, 2127, 80 L. Ed. 2d 772 (1984)). Rather, the critical inquiry is whether other modes of communication remain open through which the speaker can convey his message. See Taxpayers for Vincent, 466 U.S. at 812, 104 S. Ct. at 2132-33, 80 L. Ed. 2d at 791-92 (citations omitted).

Because a municipality bears the burden of establishing that a challenged ordinance that burdens protected expression is constitutional, the municipality must identify alternative channels of communication that appear adequate to convey the speaker's message. However that does not mean that the municipality, as part of its initial showing, also, must negate every conceivable argument that might be made as to why those channels are inadequate. Such a requirement would impose an impossible burden on the municipality because the municipality, ordinarily, would

have no way of knowing why a plaintiff might contend that particular channels of communication might not adequately serve the plaintiff's purposes. Since that information generally is exclusively, or at least more readily, available to the plaintiff, once the municipality has identified what appear to be adequate alternative channels, it is incumbent upon the plaintiff to explain why the proffered alternatives are inadequate. See Ward, 491 U.S. at 802, 109 S. Ct. at 2760, 105 L. Ed. 2d at 683 (upholding limitations on the volume of music played during a presentation in a public park because "there has been no showing that the remaining avenues of communication are inadequate") (citations omitted); see also Lawton v. Nyman, 357 F. Supp. 2d 428, 436 (D.R.I. 2005) (the burden of presenting evidence to support a contention generally should fall upon the party to whom the evidence "is more readily available") (citing Pidcock v. Sunnyland Am., 854 F.2d 443, 448 (11th Cir. 1988)); accord La Montagne v. Am. Convenience Prods., Inc., 750 F.2d 1405, 1409-10 (7th Cir. 1984) (explaining that this principle animates the now-familiar burden-shifting analysis in employment discrimination cases) (citations omitted); see 1 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 301.06[1] (2d ed. 2006) (acknowledging the "evidentiary consideration[]" of "allocating the burden of production to the party most likely to have access to the pertinent evidence") (citations omitted). Of course, once the plaintiff presents

evidence that the proffered alternatives are inadequate, the burden shifts back to the municipality to rebut that showing.

B. The East Greenwich Permit Requirement

ACORN claims that East Greenwich's permit requirement for door-to-door solicitation unconstitutionally burdens ACORN's freedom of expression, and that the burden is increased by allowing for a delay of up to five days before a permit is issued and by requiring an application fee in order to obtain a permit. The Town argues that the permit requirement passes constitutional muster because it serves the Town's interests in preventing fraud, preventing crime, and protecting the privacy of residents.

ACORN cannot and does not dispute the importance of the Town's proffered interests. Nor does ACORN dispute that the Ordinance is content-neutral. Rather, ACORN's challenge focuses on whether the permit requirement actually furthers the Town's proffered interests and whether it is "narrowly drawn" to further those interests "without unnecessarily interfering with First Amendment freedoms." See Schaumburg, 444 U.S. at 637, 100 S. Ct. at 836, 63 L. Ed. 2d at 87-88 (citations omitted).

1. Furtherance of the Town's Interests

(a) Fraud Prevention

East Greenwich's permit requirement helps to serve the Town's interest in preventing fraud in several ways.

First, the permit requirement helps to prevent individuals

from soliciting on behalf of non-existent charities and from falsely posing as authorized representatives of legitimate charities. The information that must be provided on the application form enables police to confirm the existence of the entity on whose behalf the solicitation purportedly is being conducted as well as the authority of the solicitors to act on behalf of that entity.

The information on the application also helps police to determine whether individual solicitors have a history of involvement in fraudulent schemes and requiring solicitors to identify themselves is likely to deter solicitation by individuals who engage in fraudulent practices.

Furthermore, the permit requirement enables residents to identify solicitors who have not provided the required information and to obtain more information from the police about solicitors who have permits.

The utility of the permit process in helping to prevent fraud is best illustrated by contrasting it to the situation that would exist if any anonymous stranger to the community could go door-to-door soliciting funds. Incidents such as the one recounted by Chief Desjarlais, in which an individual falsely posing as a representative of a well-known charity went door-to-door soliciting contributions, would become more commonplace. That is precisely why the Supreme Court has said:

> [w]ithout doubt a state may protect its citizens from fraudulent solicitation by requiring a stranger in the community, before permitting him publicly to solicit funds for any purpose, to establish his identity and his authority to act for the cause which he purports to represent.

Cantwell, 310 U.S. at 306, 60 S. Ct. at 904, 84 L. Ed. at 1219 (citations omitted).

(b) Crime Prevention

The Supreme Court has upheld permit requirements even for "those engaging in protected First Amendment activity because of a commonsense recognition that their existence both deters and helps detect wrongdoing." See Watchtower, 536 U.S. at 178-79, 122 S. Ct. at 2096, 153 L. Ed. 2d at 228-29 (Rehnquist, C.J., dissenting) (citing Thomas v. Chicago Park Dist., 534 U.S. 316, 122 S. Ct. 775, 151 L. Ed. 2d 783 (2002)). More specifically, it has recognized that "burglars frequently pose as canvassers, either in order that they may have a pretense to discover whether a house is empty and hence ripe for burglary, or for the purpose of spying out the premises in order that they may return later." Martin, 319 U.S. at 144, 63 S. Ct. at 864, 87 L. Ed. at 1317.

East Greenwich's permit requirement helps to prevent burglary because it is unlikely that a burglar would wish to identify himself by completing an application form or to call attention to himself by soliciting without a permit. Consequently, the permit requirement helps to deprive prospective burglars of at least one of the pretexts commonly used in facilitating their crimes.

Moreover, the background checks performed as part of the permit process enable police to identify solicitors with criminal records that may indicate a propensity to commit violent crimes as well as to monitor their activities and/or alert residents.

It is true that the Town did not make a very strong showing of a "special crime problem related specifically to door-to-door solicitation." Cf. Watchtower, 536 U.S. at 169, 122 S. Ct. at 2091, 153 L. Ed. 2d at 221. The Town's evidence consisted primarily of Chief Desjarlais' testimony that his department receives between 25 and 35 complaints of breaking and entering each year, which he did not link specifically to house-to-house solicitation; an incident of fraud and a stolen car incident, both of which did involve door-to-door solicitors; and the fact that background checks often reveal that applicants have criminal records or outstanding warrants.

The absence of a demonstrable link between burglars and door-to-door solicitors is not surprising because, unless a burglar is apprehended and recognized by a resident, it would be virtually impossible to prove that he or she had been engaged in door-to-door solicitation. Indeed, arguing that the absence of any demonstrable link between burglaries and door-to-door solicitation somehow shows that the Ordinance does not serve the Town's interest in preventing crime misses the point because one of the justifications for the permit requirement as a means of combating crime is that it helps

a municipality to prevent burglaries by denying burglars the opportunity to pose as door-to-door solicitors.

In any event, given the fact that the Supreme Court has long recognized what common sense confirms is the increased risk of crime posed by unregulated door-to-door solicitation, see, e.g., Hynes, 425 U.S. at 618-19, 96 S. Ct. at 1759-60, 48 L. Ed. 2d at 251-52 (citations omitted); see, e.g., Martin, 319 U.S. at 144, 63 S. Ct. at 864, 87 L. Ed. at 1317, it would make little sense to prohibit a municipality from regulating such activity until after it could conclusively prove that residents actually had been harmed.

It also may be true that the permit requirement does not guarantee the complete elimination of crime at residents' homes because burglars still may knock on residents' doors on pretenses other than solicitation of funds, see Watchtower, 536 U.S. at 169, 122 S. Ct. at 2091, 153 L. Ed. 2d at 221, and violent crimes still may be committed by individuals not purporting to be solicitors. However, "[i]n order to survive intermediate scrutiny . . . a law need not solve the crime problem, it need only further the interest in preventing crime." Id. at 179-80, 122 S. Ct. at 2096-97, 153 L. Ed. 2d at 228 (Rehnquist, C.J., dissenting). Although the East Greenwich Ordinance will not eradicate all crime in the Town, the fact that it helps to prevent some crime is sufficient to establish that it serves an important municipal interest.

(c) Protecting the Privacy of Residents

It is difficult to see how the permit requirement serves the Town's interest in protecting the privacy of residents. Since the issuance of a permit is virtually automatic, the permit requirement seems unlikely to significantly reduce the number of unwanted knocks on residents' doors.

2. The "Narrowly Drawn" Requirement

As already noted, in deciding whether a permit requirement is "narrowly drawn," a court must determine whether it burdens substantially more speech than is necessary to further the government's important goals. See Ward, 491 U.S. at 798-800, 109 S. Ct. at 2757-58, 105 L. Ed. 2d at 680-81 (citations omitted). This Court finds that the East Greenwich permit requirement is narrowly drawn because the burden of obtaining a permit is not an onerous one and the requirements are closely related to furthering the Town's interest in preventing fraud and other crimes.

A permit is required only when canvassing involves the solicitation of money, which is the type of canvassing that poses the greatest risk of fraud. Furthermore, while laws against fraud may enable a municipality to prosecute solicitors who engage in fraudulent practices after the fraud has been perpetrated, it is difficult to imagine how a municipality could effectively prevent its residents from being defrauded without requiring solicitors to obtain permits.

In addition, under the Ordinance, Town officials have no discretion to deny a permit. Obtaining a permit requires little more than completing an application form, which makes East Greenwich's Ordinance similar to the identification procedure recognized as constitutional in Schneider, Cantwell, and Murdock v. Pennsylvania, 319 U.S. 105, 113, 63 S. Ct. 870, 875, 87 L. Ed. 1292, 1299 (1943), and distinguishes it from the ordinance invalidated in Schaumburg, which completely banned solicitation by organizations that used more than a specified percentage of the funds raised to pay administrative expenses, see 444 U.S. at 624, 100 S. Ct. at 829, 63 L. Ed. 2d at 79. In Murdock, the Court distinguished between "a registration system under which those going from house to house are required to give their names, addresses and other marks of identification to the authorities" and one that imposed unconstitutional requirements on the issuance of a license. See 319 U.S. at 113, 63 S. Ct. at 875, 87 L. Ed. at 1299.

Nor does completing the application or the fact that permits are not issued instantaneously impose any burden that is disproportionate to the Town's interest in preventing fraud and crime. The application calls for little more than the identities of the organization and individuals conducting the solicitation as well as where and how the solicitation is to be conducted. That information permits Town officials to verify the existence of the

entity on whose behalf the solicitation purportedly is being conducted, to confirm the authority of the individual solicitors to act on behalf of that organization, and to determine whether the individual solicitors have criminal records or past involvement with fraudulent schemes. That information also enables police to monitor the solicitation activity and to respond more effectively to calls from residents who may wish to know something about the solicitors appearing at their doors.

The same may be said with respect to the delay between the time that an application is filed and the time that the permit is issued. Some delay is inevitable in any permit process. Accordingly, courts have upheld the constitutionality of "waiting periods" if they are reasonably necessary to enable a governmental body to further its legitimate goals. See, e.g., A Quaker Action Group v. Morton, 516 F.2d 717, 735 (D.C. Cir. 1975) (approving two-day waiting period for permit to use national park lands within the District of Columbia because it "provide[d] the Park Service ample notice and time to process the application"); see, e.g., Powe v. Miles, 407 F.2d 73, 84 (2d Cir. 1968) (approving two-day advance notice requirement for demonstrations on state university campus because it "afford[ed] a desirable opportunity for the administration and the demonstrators to work out detailed methods for the conduct of the protest in a manner compatible with the legitimate interests of all") (citation omitted); see, e.g., Local

<u>32B-32J, Serv. Employees Int'l Union, AFL-CIO v. Port Auth.</u>, 3 F. Supp. 2d 413, 422 (S.D.N.Y. 1998) (upholding one and one-half day waiting period on "expressive activity permits" for World Trade Center and Port Authority Bus Terminal property so that a sufficient police presence could be assembled to prevent disruptions during events).

Here, a delay is necessary in order to enable police to verify the information provided by the applicant and to perform background checks on the individual solicitors. While the Ordinance states that applications must be filed at least five days before the proposed solicitation, the evidence shows that, as a practical matter, permits, ordinarily, are issued within one or two days unless difficulties are encountered in verifying the information provided or in determining whether the individual solicitors have criminal records.

In addition, since the canvassing in this case involves solicitation of money, the delay appears to be far less burdensome than it might be in the case of canvassing that involves nothing more than the communication of ideas. Unlike purely communicative speech that sometimes may be spontaneous, fundraising presumably requires considerable advance planning and organization that takes place well before solicitation begins. Since that planning undoubtedly begins at least several days before the proposed solicitation, it appears that solicitors could minimize or

completely eliminate any delay by filing an application when those plans are formulated rather than waiting until the day of the proposed solicitation.

With respect to the Town's application fee, it is true that an application fee requirement can impose an unconstitutional burden on protected expression when the fee is excessive or when it is unrelated to the advancement of the government's legitimate interest(s), but a fee that does satisfy those requirements is not unconstitutional. See, e.g., Forsyth County, 505 U.S. at 136-37, 112 S. Ct. at 2404-05, 120 L. Ed. 2d at 115 (citations omitted); see, e.g., Murdock, 319 U.S. at 108-17, 63 S. Ct. at 872-77, 87 L. Ed. at 1295-1301 (citations omitted).

East Greenwich has not presented any evidence as to how it arrived at the application fee that it charges. In a trial on the merits, that omission would be fatal to the application fee provision in the Ordinance, but, at the preliminary injunction stage, the Court's task is to assess the likelihood that the Town, ultimately, will succeed in justifying the fee provision. Since it appears that, if anything, the nominal fee charged by the Town probably understates the expenses the Town incurs in processing permit applications and verfiying the information provided in them, it seems likely that the Town will be able to prove that the fee is narrowly drawn.

In short, because an application is a necessary part of any

permit procedure, because some delay is necessary in processing the application, and because a municipality may charge a reasonable fee in order to defray the processing costs involved, these features do not render a permit requirement unconstitutional, *per se*. To hold otherwise would be tantamount to saying that permit requirements themselves are inherently unconstitutional, a proposition that flies in the face of well-established Supreme Court precedent recognizing the validity of permit requirements. See, e.g., Thomas, 534 U.S. 316, 122 S. Ct. 775, 151 L. Ed. 2d 783 (upholding permit requirement to regulate use of public park); see, e.g., Cox v. New Hampshire, 312 U.S. 569, 61 S. Ct. 762, 85 L. Ed. 1049 (1941) (upholding local parade permit requirement).

C. The East Greenwich Curfew

1. Furtherance of the Town's Interests

(a) Protecting the Privacy of Residents

It is well-established that every individual has a right to privacy, the essence of which is the right to be left alone. See Katz v. United States, 389 U.S. 347, 350, 88 S. Ct. 507, 510-11, 19 L. Ed. 2d 576, 581 (1967) (citing Samuel Warren & Louis Brandeis, The Right to Privacy, 4 Harv. L. Rev. 193, 196 (1890)); see, e.g., Galella v. Onassis, 353 F. Supp. 196, 232 (S.D.N.Y. 1972), rev'd, in part, on other grounds, 487 F.2d 986 (2d Cir. 1973). That right is especially strong at an individual's home. See Frisby v. Schultz, 487 U.S. 474, 484, 108 S. Ct. 2495, 2502, 101 L. Ed. 2d

420, 431 (1988) ("'preserving the sanctity of the home, the one retreat to which men and women can repair to escape from the tribulations of their daily pursuits, is surely an important value'") (quoting Carey v. Brown, 447 U.S. 455, 471, 100 S. Ct. 2286, 65 L. Ed. 2d 263 (1980)).

The right to privacy in one's home includes not only the right to be free from unreasonable searches and seizures but also the right to be free from unwanted and unwelcome intrusions. See FCC v. Pacifica Found., 438 U.S. 726, 748, 98 S. Ct. 3026, 3040, 57 L. Ed. 2d 1073, 1093 (1978) ("in the privacy of the home . . . the individual's right to be left alone plainly outweighs the First Amendment rights of an intruder") (citing Rowan v. U.S. Post Office Dep't, 397 U.S. 728, 90 S. Ct. 1484, 25 L. Ed. 2d 736 (1970)); see Hynes, 425 U.S. at 619, 96 S. Ct. at 1760, 48 L. Ed. 2d at 252 ("[H]ome is one place where a man ought to be able to shut himself up in his own ideas if he desires. There he should be free not only from unreasonable searches and seizures but also from hearing uninvited strangers expound distasteful doctrines.") (quoting Zechariah Chafee, Free Speech in the United States 406 (1954)). Intrusions on an individual's right to privacy include uninvited knocks on the door and the need to confront and turn away unwelcome visitors. "A doorbell cannot be disregarded like a handbill. It takes several minutes to ascertain the purpose of a propagandist and at least several more to get rid of him." Id.

Consequently, an individual's right to privacy in his or her home is an important factor in assessing the extent to which a municipality may regulate door-to-door solicitation. Indeed, there is no question that a municipality can enact ordinances that reasonably protect residents' privacy rights. See Frisby, 487 U.S. at 484-85, 108 S. Ct. at 2502, 101 L. Ed. 2d at 432 ("a special benefit of the privacy all citizens enjoy within their own walls, which the State may legislate to protect, is an ability to avoid intrusions") (emphasis added); see Munhall, 743 F.2d at 186 ("The privacy of the home, and the obligation of government to protect that privacy, are entitled to particular solicitude from the courts.") (citations omitted).

East Greenwich's 7:00 p.m. curfew serves the Town's interest in protecting the privacy of its residents. The 7:00 p.m. curfew was adopted in response to complaints by residents regarding what, then, was a 9:00 p.m. curfew. Those complaints and the fact that the amendment was enacted by the Town's elected officials who, presumably, reflect the views of a majority of residents are powerful evidence that most residents consider solicitations between 7:00 p.m. and 9:00 p.m. to be unwelcome invasions of their privacy. There is nothing surprising about that because it doesn't require an elaborate survey or the testimony of thousands of residents to confirm that, between 7:00 p.m. and 9:00 p.m., many residents are either eating dinner, preparing for bed, or lounging

in their pajamas and do not wish to be disturbed.

While the fact that a majority of residents may favor a 7:00 p.m. curfew cannot override any constitutional right that ACORN may have to solicit beyond that hour, it does indicate that solicitation after 7:00 p.m. infringes on the privacy rights of residents and that is a factor to be considered in determining whether the curfew is a reasonable means of protecting those rights. By the same token. while residents may be more likely to be at home between 4:00 p.m. and 9:00 p.m. than at other hours is a factor to be considered in determining the extent to which the curfew burdens ACORN's speech rights, it does not invalidate the 7:00 p.m. curfew any more than the fact that even more residents are likely to be at home at 1:00 a.m. would invalidate a midnight curfew.

(b) Crime Prevention

The Town's attempt to justify the 7:00 p.m. curfew as a means of preventing crime is somewhat undercut by its failure to present any evidence that the incidence of crime in East Greenwich is greater between the hours of 7:00 p.m. and 9:00 p.m. than it is before 7:00 p.m.

However, that failure is not fatal to the Town's contention because, as already noted, it is common knowledge that "burglars frequently pose as canvassers," Martin, 319 U.S. at 144, 63 S. Ct. at 864, 87 L. Ed. at 1317, and that crime rates increase during the

nighttime hours, see, e.g., Munhall, 743 F.2d at 187 (upholding prohibitions against door-to-door canvassing in the evening despite lack of record evidence linking darkness to increased crime rates). The Town was entitled to rely on what appears to be obvious and has been recognized by courts. See Renton, 475 U.S. at 51-52, 106 S. Ct. at 931, 89 L. Ed. 2d at 40; see Erie, 529 U.S. at 296-98, 120 S. Ct. at 1395, 146 L. Ed. 2d at 283 (O'Connor, J., for the plurality) (citations omitted).

(c) Fraud Prevention

The relationship between the 7:00 p.m. curfew and the Town's interest in preventing fraud is a different matter. Since fraud can be committed at any hour of the day or night, it is difficult to see how the curfew helps to prevent fraud.

2. Narrow Tailoring

Like the permit requirement, the curfew provision in the East Greenwich Ordinance does not burden ACORN's speech to any greater extent than is necessary to further the Town's interests in preventing crime and protecting residents' privacy. The 7:00 p.m. curfew does not ban door-to-door solicitation nor restrict, in any way, the message that may be conveyed. The curfew merely limits the times during which such solicitations may be made. It leaves ACORN free to conduct door-to-door solicitations between the hours of 9:00 a.m. and 7:00 p.m., seven days a week, as well as to solicit by other means. Furthermore, the curfew's prohibition

applies only to those hours during which solicitation is most intrusive on residents' privacy and during which there is an increased risk of crime.

It is true that the Town did not present evidence of crime rates specifically between 7:00 p.m. and 9:00 p.m. However, saying that a municipality cannot establish a curfew for door-to-door solicitation unless it can identify a magic moment at which the crime rate suddenly spikes upward would impose an impossible burden that the Constitution does not require and it would place courts in the untenable position of being called upon to make metaphysical and increasingly finite distinctions as to the hour, minute, or second that separates a permissible curfew from one that is deemed unconstitutional. A court deciding that a 9:00 p.m. curfew is constitutional but that a 7:00 p.m. curfew is not, inevitably would be called upon to decide whether an 8:00 p.m. curfew passes muster and, if not, whether an 8:01 p.m. curfew does. Courts that paint with a broad constitutional brush are ill-equipped to draw such fine lines especially where the lines depend on factors that cannot be precisely measured. In the words of Judge Coffey:

> [m]unicipal governments, rather than courts, are knowledgeable of their community's [sic] crime problems and their citizens' desire for privacy; the decision as to where to draw the line to protect homeowners' privacy and to prevent crime should be left with the municipality, so long as the accommodation of the First Amendment rights of these three groups (speakers, willing, and unwilling audience members) are reasonably accommodated.

Watseka, 796 F.2d at 1582 (Coffey, J., dissenting).

ACORN argues that the curfew provision is not narrowly tailored to protect residents' privacy because the Ordinance permits residents who do not wish to be disturbed to post "No Solicitation" signs. That argument is based on the holding in Watchtower, see 536 U.S. at 168, 122 S. Ct. at 2091, 153 L. Ed. 2d at 221 (citation omitted), but it is not convincing because Watchtower is readily distinguishable from this case.

Watchtower did not deal with a curfew provision; rather, the ordinance challenged in Watchtower prohibited canvassing without a permit and the municipality applied that prohibition not only to the solicitation of money but also to religious proselytizing. See 536 U.S. at 153-58, 122 S. Ct. at 2083-85, 153 L. Ed. 2d at 211-14. Also, in finding that the ordinance was not narrowly tailored because residents' privacy could be adequately protected by posting "No Solicitation" signs, the Watchtower Court noted that, "[h]ad [the permit] provision been construed to apply only to commercial activities and the solicitation of funds, arguably the ordinance would have been tailored to the Village's interest in protecting the privacy of its residents and preventing fraud." 536 U.S. at 165, 168, 122 S. Ct. at 2089, 2091, 153 L. Ed. 2d at 219, 221 (citation omitted).

Unlike the permit provision in Watchtower, the East Greenwich curfew does not entirely ban door-to-door solicitation; it merely

limits the hours during which solicitation may be conducted. Moreover, the curfew applies only to canvassing that involves the solicitation of money; it does not limit, in any way, what the Watchtower Court referred to as "door-to-door advocacy." See 536 U.S. at 153, 122 S. Ct. at 2083, 153 L. Ed. 2d at 211.

Requiring residents to post "No Solicitation" signs in order to prevent uninvited solicitations after 7:00 p.m. would force them to ban even those solicitors that they might welcome before 7:00 p.m. or, alternatively, to create billboard-like signs that vary from house to house specifying the circumstances under which solicitors are or are not welcome. As the Supreme Court observed in Breard:

> [t]o the city council falls the duty of protecting its citizens against the practices deemed subversive of privacy and of quiet. A householder depends for protection on his city board rather than churlishly guarding his entrances with orders forbidding the entrance of solicitors. A sign would have to be a small billboard to make the differentiations between the welcome and unwelcome that can be written in an ordinance once cheaply for all homes.

341 U.S. at 640, 71 S. Ct. at 931, 95 L. Ed. at 1247.

3. Ample Alternative Channels of Communication

It seems clear that the East Greenwich ordinance leaves open alternative channels of communication through which ACORN can effectively communicate its message and/or solicit funds.

As already noted, the curfew applies only to canvassing that involves the solicitation of money. It does not limit the hours

during which ACORN may go door-to-door for the purpose of merely advocating the causes it supports.

Moreover, the curfew leaves ACORN free to solicit money between 9:00 a.m. and 7:00 p.m., seven days per week. Except for the testimony of ACORN's two solicitors that, based on their very limited experience soliciting door-to-door, "more" people are likely to be at home between 7:00 p.m. and 9:00 p.m. than at other hours, there is no evidence indicating that a 7:00 p.m. curfew appreciably diminishes the effectiveness of ACORN's door-to-door canvassing efforts.

Furthermore, the evidence shows that ACORN also solicits by telephone, through the mail, and at fundraising events. All of these methods remain open to it and there is nothing to prevent ACORN from soliciting in public places as well.

In short, the 7:00 p.m. curfew does not, in any way, limit the channels through which ACORN may communicate its message and the rather modest restriction that it places on the hours during which ACORN may solicit funds leaves ample alternative channels available for ACORN to continue doing so.

## Conclusion

For all of the foregoing reasons, ACORN's motion for a preliminary injunction is hereby DENIED.

IT IS SO ORDERED:

Ernest C. Torres
Chief Judge

Date: September 27, 2006